IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

       v.                                  Criminal No. 3:14cr44 (DJN)

DILADE MCCOY,
      Petitioner.

## MEMORANDUM OPINION

This matter comes before the Court on Dilade McCoy's ("McCoy" or "Defendant"), a federal inmate proceeding *pro se*, motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence (the "§ 2255 Motion," (ECF No. 128)).[1] In his § 2255 Motion, Defendant contends that he received ineffective assistance of counsel.[2] Specifically, Defendant argues that the following grounds entitle him to relief:[3]

Claim One:     Trial counsel rendered ineffective assistance because "counsel failed to articulate in his Rule 29 Motion that the evidence was insufficient to sustain McCoy's drug conspiracy and substantive

---

[1] The Court notes that Defendant initially filed a motion under § 2255 ("§ 2255 motion") that did not contain any supporting facts. (ECF No. 127.) Instead, in this filing, Defendant directed the Court to see a memorandum of law that he indicated would be forthcoming. (ECF No. 127–1, at 1.) Shortly thereafter, Defendant filed the present § 2255 Motion, and he filed his supporting memorandum at that time. The present § 2255 Motion (ECF No. 128) will supplant Defendant's initial § 2255 motion (ECF No. 127). Therefore, this action proceeds solely on the present § 2255 Motion (ECF No. 128), which includes Defendant's supporting memorandum (ECF No. 129). The Clerk will be directed to administratively terminate Defendant's initial § 2255 motion (ECF No. 127).

[2] "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

[3] The Court corrects the capitalization, spelling, and punctuation in the quotations from the parties' submissions. The Court also omits any emphasis used by the parties in the quotations from the parties' submissions. The Court employs the pagination assigned to the parties' submissions by the CM/ECF docketing system.

possession convictions because it simply showed that McCoy was an accessory after the fact." (§ 2255 Mot. 4.)

Claim Two:       Appellate counsel rendered ineffective assistance because "counsel failed to appeal the District Court's denials of the Rule 29 and Rule 33 Motions." (*Id.* at 7.)

Claim Three:     Trial counsel rendered ineffective assistance because counsel "fail[ed] to file a Motion to Suppress the evidence obtained from the search of the Packard Road residence." (*Id.* at 9.)

Claim Four:      Trial counsel rendered ineffective assistance because counsel "failed to secure a material witness for trial." (*Id.* at 10.)

The Government responded, asserting, *inter alia*, that Defendant's claims lack merit. (ECF No. 133.) Defendant filed a Reply. (ECF No. 140.) For the reasons set forth below, Defendant's § 2255 Motion (ECF No. 128) will be DENIED.

## I.      PERTINENT PROCEDURAL HISTORY

On April 1, 2014, a grand jury charged Defendant with: conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine hydrochloride (Count One); possession with intent to distribute 500 grams or more of cocaine hydrochloride (Count Two); and, possession of ammunition by a convicted felon (Count Four). (Indictment (ECF No. 11) at 1-3.)

Defendant's jury trial commenced on June 16, 2014. (ECF No. 34.) Following the presentation of the Government's case, Defendant's counsel moved for judgment of acquittal on all counts pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (June 17, 2014 Tr. (ECF No. 44) 269–70.) Specifically, Defendant's counsel argued that (i) with respect to the ammunition charge (Count Four), there was a "very tenuous connection to the Packard Road address" where the bullets were found, and "therefore McCoy's connection to those bullets [was] not enough[] . . . to overcome the government's burden;" and, (ii) with respect to Counts One

2

and Two, "the government's evidence [was] lacking in that there [was] no forensic evidence that tie[d] him to the cocaine," and instead that "[was] based solely and primarily on the testimony of Tamara Williams, whose testimony should be taken with great care, and, obviously, the testimony of Officer Necolettos," which counsel argued "should [not] be believed" in light of "the chaos that's going on inside the house." (*Id.* at 269–70.) After hearing Defendant's and the Government's arguments, the Court denied Defendant's request for judgment of acquittal. (*See id.* at 271–72.) The defense then presented its case. (*Id.* at 272–80.) Defendant elected not to testify. (*See generally id.*) At the conclusion of the trial, the jury found Defendant guilty of Counts One and Two and found him not guilty of Count Four. (ECF No. 37 at 1–2.)

Thereafter, Defendant, proceeding with counsel, filed a Renewed Motion for Judgment of Acquittal, or in the Alternative, for a New Trial. (ECF Nos. 47, 48.) In this motion, Defendant argued that (i) "a charge of aiding and abetting, which is codified in 18 U.S.C. § 2, should also be charged in the Indictment if the government seeks to hold the defendant liable for violation of the law because of his specific intent to facilitate a crime," and Defendant's Indictment did not include this charge, (ECF No. 47 at 12); (ii) Defendant received inadequate notice of the aiding and abetting theory of liability after the close of evidence, (*id.* at 9–12); (iii) "the evidence at trial did not support [a jury] instruction for aiding and abetting under 18 U.S.C. § 2," (*id.* at 12); and, (iv) "this Court's aiding and abetting instruction was not a proper statement of law." (*Id.* at 13–15.) By Memorandum Opinion and Order entered on September 17, 2014, the Court denied Defendant's Renewed Motion for Judgment of Acquittal, or in the Alternative, for a New Trial. (ECF Nos. 74, 75.)

On September 17, 2014, the Court entered judgment against Defendant and sentenced him to a total of 188 months of imprisonment. (J. 2, ECF No. 76.) Defendant, through counsel,

filed a Notice of Appeal. (ECF No. 78.)  On appeal, Defendant, proceeding with counsel, argued

that his 188-month sentence for conspiracy and possession with intent to distribute cocaine was

"substantively unreasonable." *United States v. McCoy*, 804 F.3d 349, 350 (4th Cir. 2015).

Defendant also filed a *pro se* supplemental brief in which he challenged the sufficiency of the

evidence presented at his trial. (*See* ECF No. 133–3 at 1–3); *see also McCoy*, 804 F.3d

at 351 n.1.  Specifically, in Defendant's *pro se* supplemental brief, he argued, *inter alia*, that "the

District Court erred by denying [his] Motion for Judgment of Acquittal under Rule 29 of the

Federal Rules of Criminal Procedure." (ECF No. 133–3 at 2.)  Defendant asserted that:

> the evidence on Counts One and Two was insufficient because there was no
> forensic evidence tying McCoy to the cocaine, and because the evidence was
> based solely on the testimony of Tamara Williams and Detective Necolettos, both
> [of] whom should not be believed, plainly because it was apparent that Williams
> lied and because of the chaos that went on inside the house at the time of entry,
> Necolettos's testimony should also not be believed.

(*Id.* (citation omitted).)

The United States Court of Appeals for the Fourth Circuit found that Defendant's

sentence was not substantively unreasonable and affirmed the judgment of the Court. *McCoy*,

804 F.3d at 353.  Further, with respect to the sufficiency of the evidence arguments raised in

Defendant's *pro se* supplemental brief, the Fourth Circuit held: "After thorough review of these

arguments, we find that they lack merit." *Id.* at 351 n.1.  Subsequently, the United States

Supreme Court denied Defendant's petition for a writ of certiorari. *McCoy v. United States*, 137

S. Ct. 320 (2016).

## II.   SUMMARY OF RELEVANT EVIDENCE PRESENTED AT TRIAL

At Defendant's trial, Joseph Partin, a police officer for the Chesterfield County Police

Department, testified that in the days leading up to Thanksgiving Day in 2013, he received

information from a confidential informant that "the informant could get kilos of cocaine from

Tamara Williams in Chesterfield County." (June 16, 2014 Tr. 3–4, ECF No. 43.) Officer Partin

testified that "we made numerous phone calls in an attempt to arrange the purchase of kilos of

cocaine from Tamara Williams," and that ultimately, three kilograms of cocaine were ordered

from Williams. (*Id.* at 5.) In anticipation of the sale, Officer Partin stated that police officers

conducted surveillance on Williams's residence. (*Id.* at 5–6.) Additionally, Officer Partin

testified that before the sale occurred, in multiple phone calls with the confidential informant,

"Williams kept [assuring] the informant that the cocaine was coming, and he was waiting on his

guy to call. It was implied that the cocaine was coming from New York." (*Id.* at 6.) Officer

Partin stated that although he initially called off the surveillance of Williams's residence at a

little after midnight on November 28, 2013, after receiving additional information from the

confidential informant, Officer Partin directed the police officers working with him to resume

surveillance of Williams's residence. (*Id.* at 6–9.) Additionally, at around 2:30 a.m., Officer

Partin applied for and received a search warrant for Williams's residence. (*Id.* at 10–11.)

Thereafter, upon executing the search warrant and entering the residence, Officer Partin

testified that he entered the kitchen, and in that room, he saw one female and one male, both of

whom were later identified as Williams's girlfriend and Duval Turner. (*Id.* at 23–25.) Officer

Partin stated that upon entering the kitchen, he saw that Turner was cooking, and "he had

Cornish hens lined up on a big plate," and that Turner appeared to be preparing to "baste the

Cornish hens." (*Id.* at 25.) In addition to Williams's girlfriend and Turner, upon executing the

search warrant, the police also found Williams and Defendant in the residence. (*Id.* at 26.)

Officer Partin testified that he had interviewed Defendant at the residence, and Defendant

indicated that "he lived in New York and that he had come down to visit his friend." (*Id.* at 30.)

Officer Partin advised Defendant that Officer Necolettos had seen Defendant throw three

kilograms of cocaine toward the closet when the police entered the room, and Officer Partin testified that in response, Defendant said, "'You really saw me throw them in there' in a questioning kind of manner." (*Id.*) Officer Partin testified that after Officer Necolettos responded in the affirmative, Defendant stated: "I've been smoking marijuana. I don't remember what I did. I don't know what to say. I'm going to get life for this." (*Id.* at 30–31.)

Detective Matthew Dunn, a detective with the Chesterfield County Police Department, also testified at Defendant's trial. (*Id.* at 66.) Detective Dunn testified that on November 27, 2013, he conducted surveillance at Williams's residence on Cresswell Road. (*Id.* at 67.) Detective Dunn testified that at around 1:45 a.m., he "observed a dark, four-door vehicle pull into the driveway, an occupant exit the vehicle and walk to the side of the residence." (*Id.* at 70.) Approximately twenty or thirty minutes later, Detective Dunn stated that he observed "a second vehicle park in front of that residence," and the "occupant exited the driver seat and walked around to the side of the residence." (*Id.*) Detective Dunn testified that for both the first and second vehicles, he could tell that one male had exited each vehicle and entered the residence; however, he "couldn't tell really the race or anything like that," and he could not tell if either individual carried anything. (*Id.* at 71.)

Another detective with the Chesterfield County Police Department, Nathan Necolettos, testified at Defendant's trial. (*Id.* at 83.) Detective Necolettos testified that he assisted with the execution of the search warrant at the Cresswell residence, and that upon entering the residence, he went to the "rear extension room." (*Id.* at 87.) Detective Necolettos stated that, initially, the door to this room appeared to be locked; however, after "another investigator kicked the door in," Detective Necolettos ascertained that Williams and Defendant were in the room. (*Id.* at 88.) As Detective Necolettos entered the room, Detective Necolettos testified that "Williams was

directly in front of [him]," and Detective Necolettos observed Defendant "running in the direction of the closet and toss[ing] an object into the closet." (*Id.* at 89.) Detective Necolettos described the object that Defendant threw as "a square object that was green in color." (*Id.* at 90.) The square objects found in or near the closet were later determined to be packages containing a total of three kilograms of cocaine. (*Id.* at 92–93; *see, e.g., id.* at 118–19; *see also* June 17, 2014 Tr. (ECF No. 44) 266–68.)

Tamara Williams, Defendant's co-defendant, also testified at Defendant's trial. (June 16, 2014 Tr. 134.) Williams testified that he had pled guilty to conspiracy to distribute 500 grams or more of cocaine, and that he had a cooperation agreement with the Government. (*Id.* at 135.) Williams explained that his understanding of the cooperation agreement was that he was required "[j]ust to tell the truth about what [he] kn[e]w about the events that happened that led [him] to the situation." (*Id.* at 136.) Williams testified that, in terms of cocaine distribution, he is a "middleman" who "deal[s] with a client, and [he] get[s] with somebody else that has [the drugs] to supply." (*Id.* at 139.)

Williams testified that he had known Defendant since 2004, and that as a middleman, he received kilograms of cocaine from Defendant. (*Id.* at 139–40.) Williams also testified that in about 2010 or 2011, he learned that Defendant was living in Glen Allen, Virginia, on "Packard Drive or Packard Road" with his girlfriend Priscilla Larry. (*Id.* at 140–41.) Williams indicated that in early summer of 2013, he purchased a kilogram of cocaine from Defendant for a client named Stefan. (*Id.* at 141.) For that purchase, Williams testified that he and Defendant drove to New York in separate rental vehicles, and "McCoy did his purchase and we rode back to Virginia." (*Id.*) Williams testified that after that first purchase, but before November 2013, he contacted Defendant to buy three kilograms of cocaine for Stefan. (*Id.* at 143.) Williams stated

that he met Defendant close to Stefan's residence, and that he then brought the cocaine to Stefan;
however, Stefan rejected the cocaine because "he didn't like the texture," and Williams then
returned the cocaine to Defendant. (*Id.*)

In terms of the events leading to Williams's and Defendant's arrest on Thanksgiving of
2013, Williams testified that he received a call from the same client as the above-discussed sales,
Stefan, who again wanted three kilograms of cocaine. (*Id.* at 144.)  Williams stated that he then
called Defendant about getting the cocaine.  (*Id.*)  Williams testified that "[he] was waiting
probably a whole day, and the day was getting late, and [he] called Stefan, and [he] told Stefan
that [he did not] think [it was] going to happen;" however, Williams stated that Defendant
"called [Williams] probably about 12:30 that night, and he showed up at [Williams's] house" at
around 1:30 in the morning on Thanksgiving Day. (*Id.* at 144–45.)  Williams testified that
another male, Duval Turner, was also at his house at that time. (*Id.* at 145.)  Williams stated that
Turner was "cooking Thanksgiving dinner" at the house, and that Turner was "making Cornish
hens and he was going to cook carrot cake." (*Id.* at 146.)  Williams testified that Defendant and
Turner had "[grown] up as childhood friends," and that Turner worked as a cook at Dot's
Bakery. (*Id.*)

Williams stated that Turner arrived first with groceries, and "[Williams] helped him out
of the car with the groceries and McCoy probably arrived like 20 or 30 minutes later" with a
"little bag carrying the kilos." (*Id.* at 147.)  Williams testified that he then waited for Stefan to
arrive with the money. (*Id.*)  While he waited for Stefan, Williams testified that he and
Defendant were "smoking marijuana" in his "little back room." (*Id.*)  Williams testified that
Turner had also smoked marijuana "for a little bit," and that Turner then "went back into the
kitchen and continued to cook." (*Id.* at 153.)

Williams testified that while he and Defendant waited for Stefan, Defendant had asked "[w]hat was taking so long" and indicated that "he had somewhere to go." (*Id.* at 148.) Williams stated that Defendant said that "[h]e was going out of town with his girlfriend for Thanksgiving." (*Id.* at 148–49.) When asked if Defendant had driven "down from New York to stay with [Williams] for Thanksgiving," Williams stated: "No." (*Id.* at 149.)

Williams testified that when the police executed the search warrant at his residence at around 3:30 a.m., he "was in the back room of the house, the extension part." (*Id.*) Williams testified that Defendant was in this room with him, and that when they heard the police officers, Williams told Defendant to "pick up [his] stuff and go," and then Defendant "picked [the drugs] up," and opened the back exterior door and "ran out the back door." (*Id.* at 151.) When asked if Defendant "actually [left] out the back door," Williams responded in the affirmative, explaining that "McCoy opened the door and went out," and then shortly thereafter, "McCoy ran back in, [and] threw everything in the closet." (*Id.*) When asked if he "physically [saw] Defendant throw the kilos into the closet," Williams stated: "Yes, ma'am." (*Id.*) Williams testified that after the police entered the residence, he was "immediately cooperative with the police," and "[he] just told them the stuff wasn't [his], and that [he] was waiting on somebody else to come to purchase the cocaine." (*Id.* at 151–52.) When Williams was asked what he meant when he said that "the stuff" was not his, Williams stated that "[he] was meaning that it wasn't [his;] [i]t was Dilade McCoy's," and it was intended for the client, Stefan, who did not show up that day. (*Id.*)

Williams testified that, on the night of his arrest, he cooperated with the police and told them where Defendant lived. (*Id.* at 165.) Williams stated that "[he] took them there and [he] showed them precisely where McCoy lived at." (*Id.*) Williams testified that while cooperating

with the police on the night of his arrest, he also told them about Defendant's role with the drugs, and he stated that he was "100 percent truthful" at that time. (*Id.*)

Task Force Officer Thomas Kline also testified at Defendant's trial. (June 17, 2014 Tr. 211.) Officer Kline testified that he was "currently employed by the Chesterfield County Police Department and assigned to the DEA as a task force officer." (*Id.*) Officer Kline indicated that he served as "the case agent in charge of the case of Dilade McCoy," and in the course of his work on the case, he conducted "a telephone analysis of the phones that were recovered" at Williams's residence on Cresswell Road. (*Id.*) Officer Kline testified that he had shown the phones to Williams, and Williams had identified several phones as belonging to him, and he identified an area code of a phone number that belonged to Defendant, which corresponded to one of the other phones recovered at the residence. (*Id.* at 215–16.) Officer Kline testified that based on this identification, he analyzed the phone records of Williams, Defendant, and the confidential source, and determined that starting at around 12:30 p.m. on November 27, 2013, there were a number of phone calls in which the confidential source would call Williams and then, shortly thereafter, Williams would call the phone number identified as Defendant's phone number. (*Id.* at 218–25.) Additionally, there were a number of phone calls from Defendant's phone to Williams's phone and vice versa, as well as at least one series of phone calls in which the phone records indicated that Defendant called Williams's phone and then Williams called the confidential source's phone. (*Id.* at 223–25.)

Officer Kline also testified that through a subpoena, law enforcement obtained Defendant's "rental car records from February 2013 through the end of November 2013" were obtained. (*Id.* at 225.) Officer Kline stated that during this ten-month period of time, Defendant rented twenty-one vehicles, and the total cost for all of the rentals exceeded $5,500. (*Id.* at 226.)

Officer Kline also stated that 41,662 miles were put on these rental cars. (*Id.* at 227.) Officer

Kline testified that the following cars were also registered to Defendant: "a Dodge Dakota

pickup, late '90s, a 2010 Chevrolet Corvette, and a 2008 or 2009 Mercedes." (*Id.*) Officer Kline

further testified that, through a subpoena, he obtained Defendant's records from the Virginia

Employment Commission, and the records showed that from 2009 to the present, Defendant did

not obtain unemployment benefits and that during this period of time, Defendant reported no

employment. (*Id.* at 229.)

### III.   INEFFECTIVE ASSISTANCE OF COUNSEL

#### A.   Applicable Law

To demonstrate ineffective assistance of counsel, a convicted defendant must show first

that counsel's representation was deficient and then that the deficient performance prejudiced the

defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient

performance prong of *Strickland*, the convicted defendant must overcome the "'strong

presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable

professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting

*Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to

undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective

assistance of counsel claims, it is not necessary to determine whether counsel performed

deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

### B.   Claim One – Arguments Presented in the Rule 29 Motion

In Claim One, Defendant contends that his trial counsel rendered ineffective assistance, because "counsel failed to articulate in his Rule 29 Motion that the evidence was insufficient to sustain McCoy's drug conspiracy and substantive possession convictions because it simply showed that McCoy was an accessory after the fact." (§ 2255 Mot. 4.) Defendant argues that at trial, "[t]he Government's evidence showed only that by throwing the kilograms of cocaine in the closet after law enforcement's intervention, Defendant assisted Williams in order to hinder or prevent his apprehension," and "[t]hus, the evidence simply showed that McCoy was an accessory after the fact in violation of 18 U.S.C. § 3." (Br. Supp. § 2255 Mot. 3, ECF No. 129.) Specifically, Defendant asserts that:

> The evidence showed that Williams was in possession with the intent to distribute three kilogram[s] of cocaine before McCoy's arrival at the Cresswell residence. However, Williams's intent to distribute dissipated, and the drug transfer aborted, upon the arrival of law enforcement authorities. Despite aborting the drug transfer, and no longer possessing [with] the intent to distribute, his violation of the federal drug laws was nevertheless complete. At that point McCoy could not aid and abet Williams's possession with the intent to distribute because it is settled that "one cannot aid and abet a completed crime."

(*Id.* at 5 (citation omitted).) Further, Defendant argues that, because the evidence only establishes that he was an accessory after the fact, this "severely undermines the evidence that established the conspiracy." (Reply 6, ECF No. 140.) However, this argument lacks merit and only finds its basis in Defendant's interpretation of the evidence, rather than the actual evidence presented at trial.

To prove that a defendant was an accessory after the fact under 18 U.S.C. § 3, "the government must demonstrate '(1) the commission of an underlying offense against the United States; (2) the defendant's knowledge of that offense; and (3) assistance by the defendant in order to prevent the apprehension, trial, or punishment of the offender.'" *United States v. White,*

771 F.3d 225, 232–33 (4th Cir. 2014) (quoting *United States v. De La Rosa*, 171 F.3d 215, 221

(5th Cir. 1999)).  Here, as summarized in the Court's Memorandum Opinion and Order denying

Defendant's Renewed Motion for Judgment of Acquittal, or in the Alternative, for a New Trial,

the evidence presented at Defendant's trial showed that:

> . . . McCoy's co-defendant, Williams, was being investigated for distribution of cocaine hydrochloride. The investigation sought to determine Williams' source of cocaine hydrochloride.   To that end, an informant ordered cocaine hydrochloride from Williams who advised that he would have to secure it.  On November 27, 2013, the investigators conducted surveillance on Williams' residence at 3012 Cresswell Street in Chesterfield County, Virginia.   On November 28, 2013, the investigators executed a search warrant at 3012 Cresswell Street, where they encountered McCoy and Williams in a locked room at that residence.  Officer Necolettos and another individual observed McCoy throwing objects that were later identified as three separate one kilogram packages of cocaine hydrochloride into a closet.  Another witness, Officer Duquette, testified that, as he entered the room, he saw McCoy whose hand was in the air as though McCoy had just thrown something into the closet.
>
> Two kilogram packages of cocaine hydrochloride were recovered from inside the closet, and one kilogram package was recovered from the doorway of the closet.  Williams testified at trial that he and McCoy had agreed to distribute the kilograms of cocaine hydrochloride that were in the room, as well as four additional kilograms that had been distributed earlier.  As to the three kilograms that were found in the room in which Williams and McCoy were located, Williams testified that he had ordered them from McCoy.  He also stated that McCoy threw the three kilogram packages of cocaine hydrochloride into the closet as law enforcement entered the residence.

*United States v. McCoy*, No. 3:14CR044, 2014 WL 4656245, at *5 (E.D. Va. Sept. 17, 2014)

(footnote omitted).

Therefore, contrary to Defendant's assertion that the evidence presented at trial

established (i) that Williams, on his own, committed the underlying cocaine offenses, (ii) that

Defendant simply had knowledge of Williams's offenses, and (iii) that Defendant acted "to

prevent the apprehension, trial, or punishment of [Williams]," making Defendant only an

accessory after the fact to Williams's crimes, the evidence presented at trial showed that

Defendant actively participated in the conspiracy to distribute more than 500 grams of cocaine

and that he possessed more than 500 grams of cocaine with the intent to distribute them. *White*, 771 F.3d at 232–33 (quoting *De La Rosa*, 171 F.3d at 221). Specifically, the evidence presented at Defendant's trial definitively showed Defendant as the source of Williams's cocaine. The evidence presented at trial showed that, in the course of two prior transactions, as well as during the transaction on Thanksgiving in 2013, Defendant and Williams had agreed to distribute, and did distribute, multiple kilograms of cocaine to the same client who requested the cocaine around Thanksgiving in 2013. Because the evidence presented at trial showed that Defendant actively participated in the conspiracy to distribute more than 500 grams of cocaine and that he possessed with the intent to distribute more than 500 grams of cocaine, counsel reasonably eschewed the challenge that Defendant urges here. Furthermore, Defendant fails to demonstrate that counsel's inaction regarding this meritless argument resulted in any deficiency of counsel or resulting prejudice. *See Strickland*, 466 U.S. at 687, 691 (stating that reversal of conviction requires showing that counsel's deficiency prejudiced the defense to the extent of depriving the defendant of a fair trial). Accordingly, Claim One lacks merit and will be DISMISSED.

### C.    Claim Two – Arguments Presented on Appeal

In Claim Two, Defendant contends that appellate counsel rendered ineffective assistance, because "counsel failed to appeal the District Court's denials of the Rule 29 and Rule 33 Motions." (§ 2255 Mot. 7.) Specifically, Defendant argues that "[c]ounsel did not claim on appeal that the District Court improperly denied the Rule 29 and Rule 33 Motions on the ground that the evidence was insufficient to sustain Defendant's conspiracy and substantive possession convictions because the evidence only established that Defendant was an accessory after the fact," and "[t]his claim was clearly stronger than the one counsel chose to present." (*Id.* at 7–8.)

"In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, the applicant must normally demonstrate" that appellate counsel performed deficiently and that a reasonable probability of a different result exists. *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000) (citing *Strickland*, 466 U.S. at 688, 694). A presumption exists that appellate counsel "decided which issues were most likely to afford relief on appeal." *Id.* (quoting *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993)). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).

Here, Defendant faults appellate counsel for failing to challenge the denial of his trial counsel's Rule 29 and Rule 33 Motions because, as set forth in his § 2255 Motion, Defendant believes that "the evidence [at trial] only supported the theory that McCoy was an accessory after the fact." (§ 2255 Mot. 8.) However, as explained above in the Court's analysis of Claim One, this claim lacks merit. The evidence presented at Defendant's trial did not show that Defendant simply acted as an accessory after the fact. Instead, the evidence at trial showed that Defendant actively participated in the cocaine distribution conspiracy and that he possessed more than 500 grams of cocaine with the intent to distribute them. Therefore, appellate counsel reasonably eschewed raising the meritless challenge that Defendant urges here. Consequently, by failing to raise this meritless argument, appellate counsel did not "ignore[] issues [that were] clearly stronger than those presented." *Bell*, 236 F.3d at 164 (quoting *Smith*, 528 U.S. at 288).[4]

Thus, for these reasons, Defendant demonstrates no deficiency of appellate counsel or resulting prejudice. *See id.* (establishing a claim of ineffective assistance of appellate counsel

---

[4]     Moreover, on appeal, McCoy raised the same sufficiency of the evidence argument underlying Claim Two in his *pro se* supplemental brief. (*See* ECF No. 133–3, at 1–3.) In affirming the judgment of the Court, the Fourth Circuit also held that the sufficiency of the evidence arguments raised in McCoy's *pro se* supplemental brief "lack[ed] merit." *United States v. McCoy*, 804 F.3d 349, 351 n.1 (4th Cir. 2015).

requires a demonstration that "the result of the proceeding would have been different").

Accordingly, Claim Two will be DISMISSED.

### D.   Claim Three – Motion to Suppress

In Claim Three, Defendant argues that trial counsel rendered ineffective assistance,

because counsel "fail[ed] to file a Motion to Suppress the evidence obtained from the search of

the Packard Road residence." (§ 2255 Mot. 9.) In support of Claim Three, Defendant submits

his own declaration, which he signed "under the pains and penalty of perjury." (McCoy Decl. 5,

ECF No. 128–2.) In Defendant's Declaration, he states:

> My attorney asked me if I owned the house at Packard Road. I responded
> by telling him "no," that I was renting the residence, and that most of the things in
> the garage belonged to the landlord.
> My attorney stated that he would file a motion to suppress the evidence
> obtained from my home at Packard Road.
> My attorney, however, never filed a motion to suppress the evidence
> obtained from my home.
> The agent's affidavit in support of the search warrant application failed to
> establish probable cause to search my home. The bare bones affidavit merely told
> the Court that probable cause existed just because I was arrested for suspicion of
> narcotics trafficking.
> The evidence obtained from the illegal search: a digital scale, spoons with
> alleged drug residue that were never tested, a corroded flour sifter, and small bags
> was all used against me at trial to establish that I was a drug dealer. Moreover, all
> that evidence was also used by the Honorable Judge to deny my renewed Rule 29
> and Rule 33 Motions.
> Had my attorney filed a motion to suppress the evidence from my home,
> there is a reasonable probability that, in the absence of the evidence recovered
> from the illegal search, the jury would not have found me guilty of conspiracy and
> narcotics trafficking. In addition, there is a reasonable probability that the Judge
> would not have denied my Rule 29 and Rule 33 Motions.

(*Id.* ¶¶ 8–13 (paragraph numbers omitted).)

To show ineffectiveness of counsel for failing to raise a Fourth Amendment argument, a

petitioner must demonstrate that his "Fourth Amendment claim is meritorious and that there is a

reasonable probability that the verdict would have been different absent the excludable

evidence." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Here, Defendant argues that "[t]he supporting affidavit [for the search warrant] failed to establish probable cause to search McCoy's residence." (§ 2255 Mot. 9.) To support this argument, Defendant contends that "the affidavit was obtained with information illegally obtained from [his] cellular phone." (Reply 11 (citation omitted).) Defendant also contends that "the affidavit is devoid of any basis from which the Magistrate could infer that the evidence of drug activity would be found at the Packard Road address." (*Id.*) Defendant concedes that "[h]ad there been a scintilla of objective evidence tying McCoy to drug trafficking, probable cause to search his home might have been reasonably inferred." (*Id.*) As explained below, Defendant's claim regarding the adequacy of the affidavit supporting the search warrant application lacks merit, and Defendant's trial counsel reasonably eschewed the challenge that Defendant urges here.

After Defendant was arrested following the execution of the search warrant at the Cresswell residence, during which the police recovered, among other things, three kilograms of cocaine that Defendant had thrown in or near a closet in the residence, the police obtained a search warrant from a state magistrate to search Defendant's residence on Packard Road. (*See* ECF No. 128–1.) In applying for the search warrant, the detective set forth the following "material facts constituting probable cause," (*id.* at 5):

> On 11/27/2013, [redacted] contacted an individual and arranged the purchase of a quantity of cocaine. During the conversation, the individual told [redacted] that his source was coming down from New York with the cocaine ordered.
> Numerous conversations continued throughout the course of the day between the individual and [redacted] [i]ndicating that the source was stuck in traffic driving down from New York.
> On 11/28/2013, the individual contacted [redacted] and told [redacted] that the source had arrived at a residence in Chesterfield County with the cocaine. After receiving this information, a search warrant was obtained and executed on the residence.

After the search warrant was executed, three kilograms of cocaine was recovered along with a firearm and U.S. currency.

Dilade McCoy was found inside the residence and was interviewed by your affiant. McCoy told your affiant that he lives in New York and drove to Chesterfield County to visit his friend for the Thanksgiving weekend. McCoy stated that that he drove straight from New York to the residence in Chesterfield County. McCoy did not have any luggage or clothing items inside the residence in Chesterfield County or in the rental vehicle that he was driving.

Your affiant interviewed [redacted]. That individual made statements against [redacted] penal interest. The individual stated that [redacted] contacted McCoy to order cocaine [redacted]. The individual stated that McCoy brought [redacted] the cocaine that was recovered inside the residence. The individual also stated that McCoy resides at the residence described in section 2[5] of this document. The individual pointed out the residence described in section 2 of this document to Police. The individual has been at the residence described in section 2 of this document with McCoy on numerous occasions. The individual stated that [redacted] purchased cocaine from McCoy on numerous occasions during the past year.

On 11/28/2013, a vehicle registered to McCoy with New York plates was sitting in the driveway at the residence described in section 2 of this document.

On 11/28/2013, a black female subject was seen pacing back and forth the roadway in front of the residence described in section 2 of this document on and off her cell phone. The individual mentioned above told Police that the female subject was McCoy's girlfriend. McCoy had been arrested and your affiant had McCoy's cell phone. During this period of time, McCoy's girlfriend was continuously calling McCoy's cell phone. That same phone number continuously sent text asking why McCoy would not answer and asking if McCoy was alright.

On 11/29/2013, [redacted] was pulled over on a traffic stop by Law Enforcement. [Redacted] indicated that McCoy has a "man room" in the residence described in section 2 of this document. [Redacted] stated that [redacted] knew McCoy had been arrested and [redacted] did not know if he has anything illegal in the residence.

(*Id.* at 6–7 (redactions in original).)

As an initial matter, contrary to Defendant's assertions that the affidavit supporting the search warrant was impermissibly based on information obtained from Defendant's cellular telephone and failed to establish probable cause, the affidavit was not based solely on information obtained from Defendant's cellular telephone, and instead, the affidavit detailed the investigation conducted by law enforcement and Defendant's involvement in drug trafficking.

---

[5]    McCoy's house on Packard Road is the residence described in section 2 of the search warrant application. (*See* ECF No. 128–1, at 4.)

Specifically, as detailed in the affidavit supporting the search warrant, through investigation, law enforcement learned from an individual, who, based on the trial testimony, appears to have been Williams, that Defendant resided at the Packard Road residence, that the individual had visited the residence on numerous occasions, and that the individual had purchased drugs from Defendant on numerous occasions over the past year.

This investigation, as well as Defendant's recent arrest for drug trafficking-related activity, thus provided probable cause for officers to apply for and receive a warrant to search Defendant's residence for drug-related paraphernalia. *See United States v. Bryant*, 181 F. App'x 354, 356 (4th Cir. 2006) (concluding that "the issuing court had a substantial basis to conclude that the supporting affidavit established probable cause" when, *inter alia*, "[t]he affidavit established that [the defendant] was living at the subject residence," "[i]t detailed the affiant's familiarity with [the defendant's] history of arrests for drug charges," "[t]he affidavit further detailed the affiant's surveillance of the subject residence and the information learned therefrom," and "the affidavit detailed a recent arrest of [the defendant] by the affiant, wherein [the defendant] departed the subject residence and, after a high speed pursuit, was discovered with contraband substances"); *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000) (noting that probable cause for a search warrant "exists when 'there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search'" (quoting *United States v. Suarez*, 906 F.2d 977, 984 (4th Cir. 1990))); *cf. Bryant*, 181 F. App'x at 356 ("Great deference should be accorded an issuing court's assessment of the facts in determining probable cause.") (citing *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990)).

For these reasons, Defendant has failed to demonstrate that his "Fourth Amendment claim is meritorious . . . ." *Kimmelman*, 477 U.S. at 375. Therefore, with respect to counsel filing a motion to suppress, Defendant has failed to demonstrate (i) that counsel's representation was deficient, and (ii) that any deficient performance prejudiced the defense. Accordingly, because Defendant fails to show deficiency of counsel or resulting prejudice, Claim Three will be DISMISSED.

### E.    Claim Four – Witness Testimony

In Claim Four, Defendant contends that trial counsel rendered ineffective assistance, because counsel "failed to secure a material witness for trial." (§ 2255 Mot. 10.) Specifically, Defendant argues that trial counsel should have called Duval Turner as a witness. (*See id.* at 10–12.) Defendant speculates that Turner would have testified that "McCoy was present at Williams's residence for the sole purpose of receiving six hundred dollars from Duval Turner for the car he rented from McCoy." (*Id.* at 10.) Defendant also contends that "Turner was able to see, and in fact clearly saw that McCoy carried nothing into the residence, both when McCoy entered the residence and when McCoy greeted him." (*Id.*) In support of Claim Four, in Defendant's Declaration, he states:

> [Trial counsel] and I also discussed possible defense witnesses. I told my attorney that the reason for me being at the Cresswell home that evening was to pick up a payment from Duval Turner for the rental car he was driving. I told my attorney that I "hussled" cars, which meant that I rented vehicles from companies like Budget, and in turn rented to other people.
>
> I told my attorney that more than a week before the incident at Williams's residence I had rented a Ford Fusion for Turner. I told my attorney that the evening before Thanksgiving Day, Turner called me and told me to meet him a[t] Williams's residence in order to pay me for the Ford Fusion I had rented for him.
>
> I told my attorney that I told Turner to call me when he had arrived to Williams's residence, and I reminded Turner that the amount he owed me was six hundred dollars. I told my attorney that later that same night, close to Thanksgiving morning, Turner called again and told me that he had arrived at

Williams's residence, that he would be there for a while cooking, and that he had the six hundred dollars payment, which I could come and pick up.

I told my attorney that I rented a Ford Explorer for myself since I was leaving town for a party. And that after Turner's call, I drove to Williams's residence at Cresswell, parked my Explorer behind Turner's Fusion, and walked into the residence through the side door. I told my attorney that I had nothing but my iPhone with me in my back pocket, and that I carried nothing into the residence.

I explained to my attorney that when Williams opened the door for me to enter the residence, I saw Turner in the kitchen whisking something in a big metal bowl. I told my attorney that I greeted Turner by tapping him on the shoulder, and that Turner saw that I had brought nothing with me into the house.

I told my attorney that Williams invited me to smoke marijuana with him in the back room. I told my attorney that Turner showed up, paid me the six hundred dollars he owed me, smoked some marijuana with us, and returned to the kitchen to continue cooking. A few moments after that, the police raided the home.

For those reasons, my attorney said that Turner would be a key defense witness. My attorney asked me for Turner's information, but I was unable to provide him with any because my iPhone had been seized by the cops after my arrest. However, I told my attorney that Turner worked at a diner called "Dots Back End." My attorney told me that he knew of the place and that he would attempt to contact Turner.

My attorney, however, never made a meaningful attempt to contact Turner, or to secure his testimony. Had Turner been called to testify, he would have confirmed that he called me that Thanksgiving eve so that I could come and pick up the payment for the rental vehicle he was driving. In addition, I entered through the side door, and had nothing with me, or brought anything into the house.

(McCoy Decl. ¶¶ 14–21 (paragraph numbers omitted).)

However, although Defendant speculates about how Turner would have testified at Defendant's trial, Defendant fails to establish that Turner would have in fact testified at the trial, and Defendant fails to proffer any evidence, besides his own speculative assertions, about Turner's possible testimony. Such speculation fails to establish ineffective assistance of counsel. *See United States v. Terry*, 366 F.3d 312, 316 (4th Cir. 2004) (requiring habeas petitioner to proffer "concrete evidence" of exculpatory nature to support his ineffective assistance claim); *United States v. Vargas*, 920 F.2d 167, 170 (2d Cir. 1990) (concluding that co-defendant's affidavit, which stated in a "conclusory fashion" that the other co-defendant "had no knowledge

of [the co-defendant's] drug-related activities" failed to demonstrate that counsel's decision not to call the co-defendant as a witness was unreasonable); *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (explaining that "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative" (citation omitted)); *United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997) ("[T]he tactical decision of whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.").

Moreover, any number of strategic reasons exist for why Defendant's trial counsel may have chosen not to call Turner as a witness. *See United States v. Dyess*, 730 F.3d 354, 364 (4th Cir. 2013) (explaining that trial counsel is given "wide latitude in determining which witnesses to call as part of their trial strategy") (citing *Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir. 1998)). For example, trial counsel may have determined that if Turner testified, his testimony could have damaged more than strengthened the defense. Further, not calling Turner to testify allowed Defendant's trial counsel to suggest to the jury that Turner could have been the individual who brought the three kilograms of cocaine to the house without the risk that Turner, if called to testify, would refute this allegation.[6] (*See, e.g.*, June 17, 2014 Tr. 31–32, ECF No. 123); *see also Smith v. Stewart*, 140 F.3d 1263, 1273 (9th Cir. 1998) (discussing that "trial counsel, as a matter of strategy, [may be] much happier . . . having [a witness be] an empty chair to which [counsel] could point, without facing the danger of refutation"). Additionally, even assuming that Turner would have testified in the manner that Defendant asserts (i.e., that Turner would have testified that he owed Defendant $600.00 for the use of a rental car and that he did

---

[6]     The Court notes that the jury heard all of the evidence presented at McCoy's trial and, ultimately, the jury was not persuaded by counsel's argument about Turner's involvement.

not see Defendant carry anything into the residence), testimony on these subjects does not preclude the possibility that Turner's testimony on other subjects would have further incriminated Defendant.

Accordingly, for these reasons, Defendant fails to show deficiency of counsel or resulting prejudice with respect to Claim Four. Therefore, Claim Four will be DISMISSED.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's claims will be DISMISSED. Defendant's § 2255 Motion (ECF No. 128) will be DENIED. The Clerk will be DIRECTED to administratively terminate Defendant's initial § 2255 motion (ECF No. 127). The action will be DISMISSED. A certificate of appealability will be DENIED.

An appropriate Order will accompany this Memorandum Opinion.

Let the Clerk file a copy of this Memorandum Opinion electronically, notify all counsel of record and send a copy to Defendant.

                                        _____/s/_____
                                        David J. Novak
                                        United States District Judge

Richmond, Virginia
Date: July 20, 2020